UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

IN THE MATTER OF THE COMPLAINT
OF DELMARINE, INC. AS OWNER OF A            **ORDER**
CERTAIN 1973 18' SIGNA BOWRIDER
FOR EXONERATION FROM OR                    CV 03-6206 (ADS) (JO)
LIMITATION OF LIABILITY.

-----------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

       Plaintiff Delmarine, Inc. ("Delmarine") claims that claimants Linda Fainer and Gregory Fainer (collectively, the "Fainers") have spoliated evidence by disposing of their vessel without permitting Delmarine to inspect. On the basis of the alleged spoliation, Delmarine seeks dismissal of the Fainers' claims. For the reasons set forth below, Delmarine's motion is granted in part and denied in part. Specifically, I find that the Fainers have spoliated evidence and are subject to an appropriate sanction, but that dismissal is an inappropriately severe remedy under the circumstances. I therefore grant alternate relief, the costs of which I order to be borne by the Fainers' former counsel, whom I find to be personally responsible for the spoliation.

I.      <u>Background</u>

       This action stems from a boat accident that occurred on the Great South Bay two summers ago. Delmarine was and is the owner of a vessel named Bowrider. On June 9, 2003, Michael Starito ("Starito"), who was not a Delmarine officer, director, or managing agent, piloted Bowrider to the Great South Bay; apparently, he was to return it to Delmarine's Amityville facility later that day. At approximately 3:00 p.m., Bowrider collided with another boat, Four Winns, which the Fainers owned and operated. The Fainers, asserting that they sustained

personal injuries as a result of the collision, filed a lawsuit against Starito and Delmarine in New York State Supreme Court on September 10, 2003.

Three months later, on December 9, 2003, Delmarine commenced the instant admiralty and maritime claim pursuant to 28 U.S.C. § 1333. Docket Entry ("DE") 1. It seeks exoneration from liability for any losses, damages, or injuries incurred during the voyage of Bowrider on the ground that it did not cause or have any part in the collision. Delmarine further claims that even if it is found liable, its liability should le limited pursuant to the Limitation of Shipowners' Liability Act, 46 App. U.S.C. § 181, *et seq*. By the complaint, Delmarine offered an *ad interim* stipulation for value for Bowrider in the sum of $7,500. *See* 46 App. U.S.C. § 185.

By order dated December 11, 2003, the Honorable Sandra J. Feuerstein, United States District Judge, approved the $7,500 *ad interim* stipulation of value and directed that upon motion, an appraisal will be ordered to either increase or decrease this amount. The order further directed any claimants to file an answer to the complaint by January 26, 2004. Finally, the order stayed and enjoined any action against Delmarine or Bowrider stemming from the June 9, 2003 accident. DE 3.

The Fainers' vessel, Four Winns, had been insured by the State Farm Insurance Company ("State Farm"). State Farm, which paid the Fainers $8,500 for property damages arising out of the collision with Bowrider, retained attorney Lynn Ingrao, Esq. ("Ingrao") to represent it as the Fainers' subrogee.[1] On February 6, 2004, Ingrao filed an amended statement of claim on the Fainers' behalf seeking recovery of the $8,500 State Farm paid, asserting that Starito negligently

---

[1] Ingrao also represents the Fainers on Delmarine's second counterclaim in the state court action, which alleges that the Fainers are liable for the amount of $10,000 in property damages.

operated Bowrider and caused the accident. DE 9. On the same day, Ingrao also filed an amended answer on the Fainers' behalf. DE 10.

On February 10, 2004, Delmarine filed a motion for default judgment against the then-potential claimants the Fainers. DE 21. On March 9, 2004, the Fainers' attorney in the state court action, Mitchel Sommer, Esq. ("Sommer") cross-moved to vacate the default and to permit the Fainers to file an answer. DE 16. On May 27, 2004, the Honorable Arthur D. Spatt (to whom the case was reassigned) denied Delmarine's motion for default judgment and directed that the Fainers file an answer by June 11, 2004. Sommer did so on the Fainers' behalf on June 9, 2004. DE 25. Three weeks later, on June 30, 2004, Sommer also filed a statement of claim on the Fainers' behalf in the amount of $2,200,000 – the total amount sought by the Fainers in the state court action – on the ground that Starito negligently operated Bowrider and caused the accident. DE 27.

II. The Spoliation Claim

A. Procedural History

By letter dated November 22, 2004, counsel for Delmarine requested a pre-motion conference in anticipation of a motion to dismiss the claims of the Fainers and State Farm. DE 28. According to its letter, Delmarine had served a notice to inspect Four Winns but was told, in a letter from Sommer dated November 11, 2004, that "approximately six months after the collision, Gregory Fainer disposed of the vessel by bringing it to a town dump." *Id.* at 2. Neither Ingrao nor Sommer responded to Delmarine's request. At a conference on January 7, 2005, I set a briefing schedule. Pursuant to the schedule, the Fainers were required to serve a response to Delmarine's brief by March 4, 2005. DE 31.

At the same conference, based on Sommer's statements about the disposition of the Fainers' vessel, I voiced my concern that Sommer might be a witness in the spoliation hearing and asked if he would have a conflict of interest in continuing as counsel. In a letter dated February 18, 2005, Sommer reported that "we have retained the firm of Goldstein & Tanenbaum, LLP ... to act as both trial counsel and counsel on the Motion." DE 32. As discussed further below, it turned out that the Fainers had neither participated in nor consented to the retention of the Goldstein firm.

Neither Sommer nor the Goldstein firm served any response to Delmarine's brief, as Delmarine's counsel noted in a submission dated March 8, 2005. DE 35; *see also* DE 42. When all of the motion papers were submitted on March 11, 2005, and the Fainers still had not made any response to the motion, I entered an order directing the Fainers to notify me in writing as to whether they consented to an adjournment of the March 14, 2005, conference that I had scheduled to hear argument on the motion and also as to whether they consented to Delmarine's motion as unopposed. Endorsed Order on DE 42. The same day, an attorney from the Goldstein firm, Cory E. Skolnick, Esq. ("Skolnick") filed an affidavit on behalf of the Fainers. Skolnick asserted that as an associate of the firm representing the Fainers, she was "fully familiar with all of the facts and circumstances heretofore had herein [sic]" and went on to aver "upon information and belief" that her clients disposed of their boat "sometime between the last week of July 2003 and August 1, 2003 [sic]." DE 49 ¶¶ 1, 4.

Thereafter, I received a letter dated March 23, 2005 from yet another attorney, Jacob Shisha, Esq. ("Shisha"), who advised that he represented the Fainers, and that his clients had never spoken to the Goldstein firm and had not participated in their selection. He further

asserted that his clients' interests were not properly represented by that firm, that the Goldstein firm had not contacted his clients or solicited affidavits from them to respond to the motion. *See* DE 54. On March 29, 2005 – the date I had previously scheduled for oral argument on the motion – I held a conference to discuss the question of the Fainers' representation. The Fainers confirmed that they wanted Shisha to represent them and that they consented to the withdrawal of Sommer and the Goldstein & Tanenbaum firm as their attorneys. In light of the facts the conference revealed about the various attorneys' actions with respect to the Fainers' representation, and in particular the cavalier attitude displayed by Sommer and Skolnick in representing their client's interest in responding to a potentially dispositive motion, I permitted the Fainers to submit affidavits setting forth their knowledge of facts relevant to Delmarine's motion, notwithstanding the lateness of such submissions. DE 57. On March 30, 2005, as directed, the Fainers submitted their respective affidavits. DE 61 (Gregory Fainer), 62 (Linda Fainer). I held an evidentiary hearing and heard oral argument on the motion on April 18, 2005. DE 70.[2]

    B.    <u>The Parties' Written Submissions</u>

        1.    <u>Delmarine's Submissions</u>

            a.    <u>Declaration Of Michael A. Walters</u>

Delmarine's repeated attempts to inspect Four Winns are chronologized in the declaration of Michael A. Walters ("Walters"), which is attached to Delmarine's letter, dated February 4, 2005, DE 43 (the "Walters Dec."). Walters is president of Walters Nixon Group, Inc.

---

[2] State Farm did not file an opposition or present evidence at the hearing. It is withdrawing its damages claim and will pay the costs to repair Bowrider. DE 34.

and a non-practicing attorney. He was retained to investigate this case by Delmarine's insurer, AI Marine Adjusters, Inc. Walters Dec., ¶¶ 1, 4, 5.

Four days after the collision, on June 13, 2003, Walters telephoned Gregory Fainer and left a message. He did so again on June 16, 2003, and Gregory Fainer returned his call later that evening. In response to Walters' inquiry about the status of Four Winns, Gregory Fainer said the vessel was still in police custody and added that he was "not comfortable speaking about the facts of the accident." Walters said he would call Mr. Fainer again in two weeks. Walters followed up the conversation with a letter to Gregory Fainer the next day. *Id.* ¶ 6.

When Walters next called on June 30, 2003, he was told that the Fainers had retained Sommer. Walters contacted Sommer's office the next day, advised them of his representation, and also faxed a letter to Sommer that detailed his involvement at that time. *Id.* ¶ 7-8. Walters and Sommer spoke by telephone on July 3, 2003. Walters told Sommer that Delmarine wanted an expert to inspect Four Winns. Sommer replied that "he wasn't sure where the boat was, would check to find out, and let [Walters] know." *Id.* ¶ 9.

On July 18, 2003, Walters, not having heard back from Sommer, again telephoned Sommer and renewed his request to inspect Four Winns. Sommer told him that the police had released the boat. That same day, Walters sent a letter to Sommer memorializing the conversation and, in particular, his request for an inspection. *Id.* ¶ 10. Another week passed, and Walters still had not heard back from Sommer. On July 25, 2003, he therefore re-sent a copy of the July 18 letter and marked it as a "second request." *Id.* ¶ 11. Yet another week later, on August 1, 2003, Walters sent another letter to Sommer reiterating his request for an inspection of Four Winns. *Id.* ¶ 12.

On August 11, 2003, Walters and Sommer spoke again by telephone; Walters again said that Delmarine wanted to inspect Four Winns. Sommer said that "he was trying to learn where the Fainers' boat was, and [that] he would let [Walters] know." *Id.* ¶ 13. Later still, on September 9, 2003, Walters spoke by telephone with Trudy Adell, Esq. ("Adell"), an attorney in Sommer's office. Walters again renewed his request to inspect Four Winns, and Adell said that "she would follow up with the Fainers and let [Walters] know where the boat was, and when it would be available for inspection." This was the last conversation that Walters had with Mr. Sommer's office. *Id.* ¶ 14.

The Fainers filed their state court lawsuit the next day. Neither they nor their attorneys ever made Four Winns available to Delmarine for inspection. Neither did the Fainers, or anyone acting on their behalf, ever seek Delmarine's permission to dispose of Four Winns prior to an inspection. *Id.* ¶ 15.

                b.      <u>The Fainers' Responses to Delmarine's Request for Admissions</u>

A review of the Fainers' responses to Delmarine's Request for Admissions pursuant to Fed. R. Civ. P. 36 shows that there can be little dispute that Delmarine repeatedly requested an inspection of Four Winns. *See* DE 40 Ex. 2. In their response, prepared by Sommer on the Fainers' behalf, the Fainers generally admit the substance of each of the contacts between June 13 and August 1, 2003, to which Walters attests in his declaration, although in certain instances they cannot confirm the date or the documentation of the communications that Walters describes. *See id.* ¶¶ 4-11.

According to the response, Gregory Fainer believes that he disposed of Four Winns during the "last week of July 2003, but prior to August 1, 2003," by bringing the boat to the

"Merrick Dump." He goes on to state that he does not have a receipt for the disposal, and has no recollection of paying a fee for the disposal. The Fainers admit that neither they nor Sommer offered Four Winns for inspection before its disposal. *Id.* ¶ 12-16.

Finally, the response states that Sommer does not have a specific recollection of the August 11, 2003 telephone call with Walters, and that no telephone log exists for the call. *Id.* ¶ 17. The Fainers deny that the first time they informed Delmarine that Four Winns was unavailable for inspection was in Sommer's letter of November 5, 2004 (DE 40 Ex. D), but do not elaborate as to when, before that date, they so informed Delmarine. *See id.* ¶ 18.

### c. Declaration Of Hendrik F. Van Hemmen

Delmarine also submitted a declaration by Hendrik F. van Hemmen ("Van Hemmen") as an attachment to its letter of February 4, 2005, DE 43, to support its claim that the Fainers' alleged spoliation has caused prejudice (the "Van Hemmen Dec."). Van Hemmen is a professional engineer and was retained by Delmarine to help determine the cause of the collision at issue in this case. He says that his initial inspection of Bowrider gave him an "overview of what happened, beyond the obvious that two vessels collided ..." but that it "provided little insight into the specifics of the collision." Van Hemmen Dec. ¶¶ 1, 6. He goes on to state that he anticipated he would inspect Four Winns, and thereafter conduct any follow-up inspection of Bowrider. *Id.* ¶ 9.

The disposal of Four Winns, according to Van Hemmen, deprives him and Delmarine "of the opportunity to potentially establish with scientific and engineering certainty that [Starito] was not at fault for the collision." *Id.* ¶ 10. He adds that "there are various scenarios as to how the accident might have happened" but that he cannot opine as to the actual cause without inspecting

Four Winns. *Id.* ¶ 12. He further states that the Fainers' testimony would not be a substitute for an inspection of Four Winns, because their recollections "will be incomplete and likely molded by what they think happened rather than what did actually occur ...." *Id.* ¶ 13. Finally, Van Hemmen asserts that photographs of Four Winns (which, as set forth below, the Fainers took before taking the vessel to the Merrick Dump) would be of limited use, as they only "effectively capture details on a small portion of the vessel and do not allow [him] to look for the subtle details that are often crucial in making a reliable collision analysis." *Id.* ¶ 14.

        2.        The Fainers' Affidavits

The affidavits that the Fainers later filed with Shisha's assistance add some details to the preceding record (Skolnick's earlier affidavit, apparently prepared without consulting her clients, does not). Of particular relevance to my determination of the instant motion, the affidavits demonstrate, without refutation, that Walters never discussed his request for an inspection directly with the Fainers. DE 61 ¶¶ 2-3. They also show, again without refutation, that Sommer never passed along to the Fainers the fact that Walters had made the request of him.

On or about June 23, 2003, the Suffolk County Police Department advised the Fainers that its investigation was concluded and that they could pick up Four Winns from the Timber Point police facility. DE 61 ¶ 4; DE 62 ¶ 4. Before they did so, on June 25, 2003, State Farm representative Peter Barth inspected Four Winns at Timber Point. DE 61 ¶ 5. Soon after Barth's inspection, on either June 25 or 26, 2003, Gregory Fainer retrieved Four Winns from Timber Point and placed it in his driveway. *Id.*

The Fainers assert that the vessel's presence there proved emotionally disturbing to Linda Fainer, and that they were concerned that its exposed fiberglass shards presented a danger

to their children and others in the neighborhood who played nearby. DE 61 ¶ 7; DE 62 ¶ 6. On June 27, 2003, a State Farm representative contacted Gregory Fainer; the representative told him that "even though the boat was a total loss[, the Fainers] had to hold on to it until [a State Farm] agent removed the boat's engine for salvage." DE 61 ¶ 6. Similarly, Linda Fainer states that:

> Since we were not sure what to do with the boat after the engine was removed, I called Mr. Sommer, to the best of my recollection on or close to June 27, 2003 and asked if we could dispose of the boat. *Mr. Sommer told us that we could dispose of the boat as long as we took numerous pictures*.

DE 62 ¶ 7 (emphasis added). Gregory Fainer later took photos of Four Winns and sent them to Sommer. DE 61 ¶ 8.

On July 11 or 12, 2003, a State Farm representative removed the engine from Four Winns. The Fainers were paid $8,425.00 for the loss of the boat. DE 61 ¶¶ 9-10; DE 62 ¶¶ 8-9. Subsequently, during the last week of July 2003, Gregory Fainer disposed of Four Winns at the Merrick dump. DE 61 ¶ 11; DE 62 ¶ 10. The Fainers state that "at no time did Mr. Sommer or anyone else ever tell [them] that anyone wanted to inspect the boat or that [they] should keep the boat." DE 61 ¶ 12; DE 62 ¶ 11. They conclude that they "did not intend to destroy evidence or hide anything." DE 61 ¶ 14; DE 62 ¶ 13.

Thus, according to the Fainers' statements – which, as set forth below, Sommer does not contest – it is clear that when Walters first asked Sommer for an inspection of the vessel, Sommer had already responded to the Fainers' inquiry by advising that they could dispose of the vessel in their driveway so long as they first took pictures of it. Nevertheless, he did not advise Walters of the boat's location or its availability for inspection, nor did he communicate Walters' request to the Fainers.

C.   The Evidentiary Hearing

At the hearing on April 18, 2005, *see* DE 70, Walters, Sommer, and both of the Fainers testified. Walters and the Fainers essentially repeated their assertions described above, and acknowledged that they did not contest each other's recollection of the facts, to the extent they were able to recall them.

Sommer claimed not to have any specific recollection as to what he said to Linda Fainer during their telephone conversation on June 27, 2003. He did not, however, dispute it: he acknowledged that the statement in her affidavit to the effect that she and her husband could dispose of the boat as long as they took numerous pictures was probably what he said, and added that it is what he generally would say in similar circumstances.

Certain documents were admitted into evidence, including an undated handwritten notation by Sommer on Walters' July 18 letter, which advised someone in Sommer's office to arrange an inspection of Four Winns. Evid. Hrg. Ex. 5. Apparently, neither Sommer nor his office followed though on the notation. At a minimum, the document appears to suggest that the failure to preserve Four Winns and make it available for inspection was attributable to inattention by Sommer and others at his office, and not to any wilfulness on the part of the Fainers.

D.   The Parties' Arguments

Based on the above information and its cited case law, Delmarine requests dismissal of the Fainers' claims "by virtue of their willful and incomprehensible decision to destroy the key piece of evidence in this matter." DE 38 at 10. The Fainers, in Skolnick's affidavit, counter with several arguments. They first state that they did not have an obligation to preserve Four Winns because Delmarine did not formally serve a demand to inspect Four Winns prior to its

destruction. DE 49, Memorandum of Law at 2. They also oppose the request for dismissal on the ground that even there was spoliation, there is no evidence to support a conclusion that the Fainers' disposition of Four Winns was willful or intentional. *Id.* at 2-4. Finally, the Fainers argue that it would be premature to dismiss this case without conducting depositions. *Id.* at 4-5.

V. Discussion

    A. The Statutory Background

The Second Circuit stated that the Limitation of Shipowners' Liability Act (the "Act") was designed to foster investment in commercial shipping. *In re Guglielmo*, 897 F.2d 58, 60 (2d Cir. 1990). Despite this purpose, the court held that "pleasure yachts" are also included within the Act. *Id.* at 61. The Act "limits the liability of a vessel owner for injuries resulting from collisions to the value of the vessel and of any freight aboard where the owner is without 'privity or knowledge.'" *Id.* at 59 (citing 46 App. U.S.C. § 183(a)). In this case, Delmarine's "limitation" under the Act would arise after the Fainers, as claimants, first establish that Bowrider was unseaworthy or that the accident was caused by negligence. The burden would then shift to Delmarine to show that it lacked knowledge or privity regarding the unseaworthiness or negligence. *Id.* at 61. In its memorandum of law in support of the motion, Delmarine identifies Starito as a prospective purchaser who was test driving Bowrider. DE 38 at 2. Whether Delmarine's consent to Starito's test drive constitutes 'privity or knowledge' is not an issue before me in the instant motion. *See Matter of Group Therapy, Inc.*, 280 F. Supp.2d 21, 35-37 (W.D.N.Y. 2003) (discussing, but not adopting, claimant's theories for finding petitioners negligent). However, the Act's burden-shifting rules put in context Delmarine's interest in an

inspection of Four Winns: if it can show that the collision was not the result of Bowrider's unseaworthiness or Starito's negligence, it can limit its liability arising from the collision.

B. Spoliation

1. The Fainers Are Responsible For Spoliation

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). Given this definition, there can be no question that the Fainers spoliated evidence by disposing of Bowrider without allowing Delmarine's expert to inspect it. There is no dispute that Delmarine's agent explicitly and repeatedly asked the Fainers' agent for an opportunity to inspect the vessel, nor has any party seriously (or at least credibly) challenged that litigation arising from the collision was reasonably foreseeable at the time of the request. No later than July 3, 2003, Walters made the first of several requests for an inspection. Before that date, the Fainers had already retrieved their vessel from Timber Point, parked it in their driveway, and asked Sommer for advice on disposing of it – but they had not yet taken it to the Merrick Dump.

Nor is there any dispute that, despite the request, the Fainers took their vessel to a dump. That they did so in good faith reliance on Sommer's misguided advice should not become Delmarine's problem. As a result of Sommer's failure to pass along Walters' request for an inspection – despite knowing that the Fainers had retrieved their vessel and were interested in disposing of it – the Fainers spoliated evidence that their counsel knew Delmarine had requested, and then went on to file a lawsuit against Delmarine.

2. Crafting An Appropriate Sanction

"It has long been the rule that spoliators should not benefit from their wrongdoing." *West*, 167 F.3d at 779 (citations omitted). A court may impose sanctions under Rule 37(b) when a party spoliates evidence in violation of a court order. *Id.* (citations omitted). Even where, as here, the spoliation occurs in the absence of a court order, a court's inherent power to control litigation allows it to impose sanctions against a spoliator. *Id.* (citations omitted).

A court has broad discretion in drafting a proper sanction. *Id.* The sanction should be "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). The sanction should be designed to: (1) deter parties from destroying evidence; (2) place the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restore the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation. *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001) (citing *West*, 167 F.3d at 779). The level of intentionality associated with the spoliation will dictate the level of a sanction's severity. *Barsoum v. NYC Hous. Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001). Examples of sanctions include: (1) dismissal; (2) adverse presumption instruction; (3) excluding a party from presenting evidence opposing a claim; and (4) preventing a spoliator's expert witness from testifying about the spoliated evidence. *West*, 167 F.3d at 779-780. Dismissal is considered a drastic remedy, and should be imposed if there is a showing of willfulness, bad faith, or fault and after consideration of alternative, less drastic sanctions. *Id.*, at 779.

The difficulty in this case lies in the fact that the party responsible for the spoliation is almost as blameless as the party deprived of evidence. The Fainers spoliated evidence only

because their attorney failed to advise them of their responsibility to preserve it. I will therefore fashion a sanction that places the burden as much as possible on the person primarily responsible for Delmarine's lack of evidence, without unduly prejudicing either Delmarine or the Fainers. Under the circumstances of this case, I find that all of the potential sanctions described in the *West* opinion would excessively penalize the Fainers. *See West*, 167 F.3d at 779.

I therefore will deny all of the relief that Delmarine requests, but will instead order alternate relief. Specifically, I will require the Fainers to provide Delmarine with any information at their disposal regarding when and where they dumped their vessel. Delmarine may seek to locate the vessel at the dump and, if successful, it may have its expert examine it and introduce any opinion testimony based on that examination consistent with Federal Rule of Evidence 702. I further order that both the cost of the search for the vessel and the cost of any examination by the expert shall be reimbursed personally by Sommer. Finally, if Delmarine's expert is unable to render a reliable opinion as to the cause of the accident based on inspection of the vessel (either because it cannot be found or because its current condition renders any opinion unreliable), I order that, as alternate relief, the Fainers are precluded from introducing any expert testimony about the cause of the collision. I believe that this mix of sanctions comes as close as possible to restoring Delmarine to the position it would have occupied in the absence of the Fainers' spoliation, *Byrnie*, 243 F.3d at 107, without imposing an unfair burden either on the Fainers, whose conduct I find was not willful.

III.     Other Discovery Matters

By letter dated May 2, 2005, the Fainers advise that all factual discovery pertaining to limitation and exoneration of liability is complete. DE 72 at 1. They also advise that they have retained an expert; however, the Fainers await receipt of their deposition transcripts so that their

expert can review the transcripts and issue a report. *Id.* Thus, the Fainers' request an extension of my amended discovery schedule to permit their expert report to be served by June 6, 2005, and to allow Delmarine to serve its rebuttal expert report by July 1, 2005. Delmarine's consents to this request. *Id.* The application is granted.

The Fainers further advise that Linda Fainer's medical treatment is continuing and that her treatment may take several months; she is scheduled to undergo further tests and has also begun a course of treatment with a pain management specialist. *Id.* As a result, the Fainers will not be in a position to obtain an economist's report until they have a clearer picture of Linda Fainer's disabilities. As such, the parties stipulate that: (1) the Fainers' damages exceed the limitation fund, *i.e.*, $7,500; (2) the trial shall proceed on limitation/exoneration, without the need for evidence on the issue of damages; (3) expert discovery on damages (medical and economic) will be stayed until after limitation/exoneration is tried. Absent the parties' unanimous consent to have this case referred to a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, any application to bifurcate the trial should be directed to Judge Spatt. Unless and until the assigned trial judge approves such bifurcation of the trial, I cannot permit the corresponding bifurcation of discovery.

VII. Conclusion

Delmarine's motion to dismiss is GRANTED IN PART AND DENIED IN PART. I find that the Fainers spoliated evidence but will not grant the relief that Delmarine seeks. As alternate relief I ORDER the following:

(1) The Fainers will promptly provide Delmarine with any information at their disposal regarding when and where they dumped their vessel. Delmarine may seek to locate the vessel at the dump and, if successful, it may have its expert examine it.

(2) Attorney Sommer shall personally pay all reasonable costs of both the search for the vessel and any examination by Delmarine's expert.

(3) As alternative relief, if Delmarine's expert is unable to render a reliable opinion as to the cause of the accident based on inspection of the vessel (either because it cannot be found or because its current condition renders any opinion unreliable), the Fainers will be precluded from introducing any expert testimony about the cause of the collision.

In addition, the Fainers' request for an extension of my amended discovery schedule to permit their expert report to be served by June 6, 2005, and to allow Delmarine to serve its rebuttal expert report by July 1, 2005, is GRANTED on consent.

Finally, the parties' joint request to postpone the completion of discovery as to damages is DENIED without prejudice to renewal after the assigned trial judge rules on the parties' application to bifurcate the trial.

**SO ORDERED.**

Dated: Central Islip, New York
       May 26, 2005

                                             /s/ James Orenstein
                                             JAMES ORENSTEIN
                                             U.S. Magistrate Judge