UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

IN THE MATTER OF THE COMPLAINT OF
DELMARINE, INC., AS OWNER OF A CERTAIN
1973 18' SIGNA BOWRIDER FOR EXONERATION
FROM OR LIMITATION OF LIABILITY.

**MEMORANDUM OF
DECISION AND
ORDER**
CV 03-6206 (ADS)

-----------------------------------------------------------------------x

A P P E A R A N C E S :

BENNETT, GIULIANO, MCDONNELL & PERRONE, LLP
Attorneys for Delmarine, Inc. and
Defendant Michael J. Starito, Jr.
225 West 34th Street
New York, New York 10122-0402
By:     JOSEPH J. PERRONE, Esq., of Counsel

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★    OCT 2 4 2006    ★

*10 4?c7?lian*
LONG ISLAND OFFICE

TABAK, MELLUSI & SHISHA, ESQS.
Attorneys for the Claimants Linda Fainer and
Gregory Fainer
29 Broadway
New York, New York 10006
By:     JACOB SHISHA, Esq., of Counsel

**SPATT, District Judge.**

Never before have water-based recreational activities been so popular. Each

summer lakes, rivers, harbors and seas of the United States teem with recreational

watercraft. If undertaken with proper regard for safety, these activities provide great

enjoyment. Regrettably, safety is often neglected by careless operation or improper

lookout.

On June 9, 2003, at approximately 3:00 P.M., in the Great South Bay of Long

Island, two motor boats collided, causing serious injuries to Linda Fainer ("Linda") a passenger in the Fainer boat operated by her husband Gregory Fainer ("Gregory"). Based on their personal injuries sustained in the collision, the Fainers commenced a lawsuit in New York Supreme Court, Nassau County, on September 10, 2003. Three months later, on December 9, 2003, Delmarine Inc., the owner of the Signa motorboat commenced a maritime claim pursuant to the limitations of Shipowners' Liability Act, 46 App. U.S.C. § 181, *et seq.,* now 46 U.S.C. § 30503 *et seq.,* to limit its liability. The State Supreme Court action was removed and consolidated with the pending federal court action. The Gregory Fainer personal injury claim has been settled. Remaining, for this Court's consideration, is Linda's claim for damages.

In this non-jury maritime action, the Court must determine the fault between the Delmarine vessel and the Gregory Fainer vessel, and the damages sustained by Linda. The parties have stipulated to resolving the issue of limitations of liability pursuant to an agreement. The issues before this Court are (1) responsibility for the collision, and (2) if Delmarine or Michael Starito, Jr. ("Starito"), the operator of the Delmarine vessel, are found at least partially at fault, the Court must make a determination as to the damages due to Linda.

Initially, the Court notes that, in their trial memorandum of law dated July 23, 2007, counsel for Delmarine and Starito stated that "since both parties violated Rule 5 and Greg Fainer also violated Rule 9, a 66.7% attribution to Greg Fainer and 33.3%

2

attribution to Delmarine as a split in liability is the correct result." The references to Rules 5 and 9 refer to the Steerage and Sailing Rules of Title 33 U.S.C. § 2005 (Rule 5) and § 2009 (Rule 9). Also, in their Post-Trial Submission dated September 7, 2007, counsel for Delmarine and Starito stated "Upon all of the testimony educed (sic) at trial, the Delmarine's position that liability is at best 50/50, and should in fact be 40% Delmarine, 60% Greg Fainer." In addition, in his closing arguments on September 12, 2007, counsel for Delmarine stated that, as to liability, this case was "at best, 50-50."

## I. <u>THE SPOLIATION ISSUE</u>

In response to repeated requests by Delmarine's counsel to inspect the Fainers' Four Winns boat, it was revealed that Gregory Fainer disposed of Four Winns by bringing it to the "Merrick Dump" during the "last week July 2003, but prior to August 1, 2003." The Fainers admitted that neither they nor their then attorney Mitchell Sommer, Esq. offered Four Winns for inspection by Delmarine's expert retained to determine the cause of the collision. On the basis of a claim of spoliation, Delmarine moved to dismiss the Fainers' claims. Following a hearing before United States Magistrate Judge James Orenstein, he found that, as a result of "misguided advice" from their former attorney, "the Fainers spoiled evidence (the Four Winns boat) that their counsel knew Delmarine had requested . . . .". Magistrate Judge Orenstein further found that:

> "The difficulty in this case lies in the fact
> that the party responsible for the spoliation
> is almost as blameless as the party deprived

3

> of evidence. The Fainers spoliated evidence
> only because their attorney failed to advise
> them of their responsibility to preserve it. I
> will therefore fashion a sanction that places
> the burden as much as possible on the
> person primarily responsible for Delmarine's
> lack of evidence, without unduly prejudicing
> either Delmarine or the Fainers.

The remedy directed by Judge Orenstein, in the event the Delmarine expert was

unable to render a reliable opinion as to the cause of the accident based on an inspection

of the vessel, was that "the Fainers are precluded from introducing any expert testimony

about the cause of the collision." As Delmarine's expert was unable to examine the

Fainer boat and render an opinion as to the cause of the accident, the Fainers did not

present any expert testimony as to the cause of the collision.

## II. THE TRIAL

### A.    As to Liability

Gregory Fainer, the husband of Linda, testified that he grew up in Massapequa on

the south shore of Long Island. His family owned boats since he was 8 years old. He

owned a sailboat from the age of 14, which he operated on the Great South Bay. In June

2003 Gregory owned a 1990 Four Winns 205 Sundown outboard motorboat. ("Four

Winns"). The craft was 20 ½ feet long and had a 175 horsepower Evinrude outboard

motor. When the engine was brand new the boat could achieve a speed of 45 to 48 miles

per hour. Photographs of the Four Winns after the collision were introduced (see

4

Claimant's Exhs. 3A to 3J). The photographs show extensive damage to the port side of the boat toward the stern.

Gregory was an experienced boat enthusiast. He kept his boat in a canal at his Neptune Avenue home in Seaford. He used the boat 30 to 50 times a year. Gregory was very familiar with the Great South Bay for most of his life.

On the afternoon of June 9, 2003, between 2:30 and 3:00 p.m., when the sun came out, the Fainers decided to take the boat out and go to Gilgo Beach at the southern end of the Great South Bay. Gregory drove his boat with Linda as a passenger. He proceeded out of the canal near his house and made a left turn to head east in South Oyster Bay. He "cut through the flats area" and came up to Unqua Point and entered the channel heading east. Gregory intended to make a right turn from the channel to enter the Amityville cut in a southerly direction to the Gilgo Beach area. He had previously made this trip 30 or 40 times.

The weather was sunny and clear with good visibility and a light wind. Gregory was not wearing his prescription glasses for distance, but he stated that he did not need the glasses for driving or for operating the boat. Gregory was operating the boat from the starboard (right) side standing near the captain's chair. Linda was sitting in the seat directly across from Gregory, on the port (left) side. It took him 5 to 10 minutes to traverse the canal at a speed of under 5 miles per hour. When he left the canal, Gregory increased the speed to 20 to 25 miles per hour bringing the boat up on a plane, so that the

5

bow would be horizontal and level. He maintained that speed of 20 to 25 miles per hour until the time of the accident.

Once past the canal, there were no speed restrictions or traffic signals. As to right-of-way, the rules of the road dictated that boats ahead of him or on his starboard side had the right-of-way. He had the right of way with regard to boats on his port side. From his twenty years of boating experience, Gregory knew that he had to maintain a lookout to the front and to his starboard and port sides. Gregory stated that, under normal circumstances, he did not have to maintain a lookout behind his craft, except when making a U-turn.

Gregory proceeded east "over the flats" to Unqua Point, at which point, "at the buoy" he entered the channel. He intended to take the channel eastbound to the Amityville cut, which would take him to Gilgo Beach. As he entered the channel, he looked to his port side and saw a few boats proceeding south in the cove, not near him and that was "nothing of concern." With regard to any boats proceeding south, he would have the right of way. At that point he still had a clear unobstructed view with regard to vessels approaching in a southerly direction from the cove. Gregory then changed his focus to look ahead and to his starboard side to the Amityville cut. He was preparing to turn right and enter the Amityville cut from the channel. Looking to the starboard, there was another boat coming north in the Amityville cut and a vessel proceeding west directly ahead of him, so that, at the time of impact, he was looking forward and to his right side.

6

Gregory never saw the Delmarine vessel before the impact. As he described, "I was driving, and all of a sudden I hear like a boom and I found myself in the water." (Tr at 97)*. While in the water he spoke to Starito, the operator of the Delmarine boat, who said "he didn't see me, that, I'm sorry, I was looking down at my gauges." (Tr at 98). Starito picked him out of the water and took him to his boat.

As a result of the impact, there was extensive damage to the port side toward the stern (rear) on the Fainer craft. (See Claimant's Exhs 3A to 3J). As to the Delmarine boat there was damage to the bow (front) (see Delmarine's Exhs 4A to 4J). So that the point of impact in this collision was the bow of the Delmarine vessel with the port side toward the stern of the Fainer boat. (See the photographs of the Fainer boat in Appendix A, and the photographs of the Delmarine boat in Appendix B, both annexed).

When Starito drove Gregory to his boat, he saw Linda wedged into the driver's seat. She was unconscious. The Suffolk County Police Department responded in 15 to 20 minutes. Linda was still unconscious. The police removed her from the seat and carried her to a police boat in an unconscious state. Linda was then taken by helicopter to Stony Brook University Hospital.

On cross-examination, Gregory stated that he was familiar with the maritime rules of the road, including the duty to keep a lookout. However, he stated that he had the duty to look ahead, left and right, but had to look behind only if making a turn. Gregory

---

\* Tr refers to the trial transcript.

conceded that he never saw the Delmarine boat before the impact and made no effort to avoid the collision even though nothing was blocking his view. He also conceded that one photograph, (Claimant's Exh 3A), shows some damage on the port side of his boat forward of where the seating positions are located. Gregory stated that the channel was narrow, some 20 to 30 feet wide, and that he was within the channel when the collision occurred. Prior to the collision, Linda was sitting in the passenger's seat. He confirmed that Linda has no recollection of the accident.

Michael Starito Jr. testified in the Fainer's case. He is 58 years old, has a Coast Guard license, has been boating for 38 years and is familiar with the rules of the road. From 1974 to 1996 he was the owner of Delmarine, Inc., a company that stores and repairs boats, located in Amityville, New York, which entity is the owner of the boat involved. After he sold the company to the present owner, he continued to conduct bay tests of water craft for Delmarine. During the bay tests Starito checked the RPM, water pressure and the various gauges at different speeds.

On the day of the accident, Chris McGuirk, the present owner of Delmarine, asked Starito to bay test the 18' Signa Craft owned by Delmarine. Starito started the bay test at almost 2:30 p.m. He was alone on the boat. Visibility was clear and the waves were low. It was an ideal condition to operate the craft. Starito was planning to enter the channel in an eastbound direction. He had no problem seeing from his seat in the craft. Starito was proceeding south and the Fainer vessel was proceeding east thus creating a crossing

8

situation. He stated that he actually saw the two boats come in contact, but it was a "snapshot" only at impact. He saw nothing before contact. Starito described what occurred, as follows:

Q. Would you have a crossing situation?

A. If that situation existed, yes, it would be a crossing situation.

Q. You would be off of Mr. Fainer's port bow; is that correct?

A. Yes.

Q. And under the rules of the road, Mr. Fainer would have the right-of-way; is that correct?

A. Yes.

Q. And vessels – you said before, vessels that are coming from east to west, in this course, would have the right-of-way over a vessel heading south; is that correct:

A. In that hypothetical situation, yes.

* * * * * *

Q. Now, in that situation where we are going to assume that the line you drew and the line that Mr. Fainer drew is the course of the two vessels, in that situation, the Fainer vessel would have the right of way; is that correct?

A. Yes.

Q. Under the rules of the road, he would be referred to as the stand-on vessel?

A. Yes.

Q. That means he's supposed to stand on and hold his course; is that correct?

9

A. Yes.

Q. Your vessel would be referred to as the give-way vessel?

A. Yes.

Q. And that would mean it would be your obligation to give way, to move out of his way?

A. Yes.

\* \* \* \* \* \*

Q. Now, there's no question in your mind, had you seen the vessel, you would have turned to starboard and gone astern of him?

A. I would have altered course.

\* \* \* \* \* \*

Q. All right. Now, you said before, a prudent mariner would keep a lookout especially ahead of you; is that correct?

A. Yes.

Q. Now, was there anything, dredges, other vehicles, that blocked your view of going ahead?

A. The only thing is possibly the windshield frame.

Q. That's not what I asked. Were there any vessels or other obstructions?

A. There were no vessels in the bay at that time.

Q. The first time that you saw the Fainer vessel was right before impact; is that correct?

A. Yes.

P-049

Q. Did you tell the police that the vessel, that the Fainer vessel, appeared out of nowhere, as if by magic?

A. Yes.

\* \* \* \* \* \*

(Reading from the deposition of Michael Starito, Jr.).

Q. Did the bow of your vessel come in contact with the port stern of the other vessel?

A. Yes. I don't know what angle, but I believe it did (indicating).

Q. You've been in this business for a long time:

A. Uh-huh.

Q. Based on the damage that you saw, did it appear to you that he was - - that he was - - the fact that your bow was on his port side on the stern, you were heading in a south direction and he was heading in an east direction, or can't you tell?

A. Uh-huh. It appeared that way, yes.

BY MR. SHISHA:

Q. Do you remember giving that testimony?

A. Yes, I do.

\* \* \* \* \* \*

Q. Now, this was a clear day. There was no obstruction in front of you, and you have no definite idea why you didn't see this boat.

A. When you say obstruction in front of me, you mean a vessel?

Q. There were no vessels in front of you. There were no structures out on the

11

water. Ideal conditions. And you don't know for sure if you have any reason why you didn't see this vessel?

A.   No.

Q.   The vessel, when you struck it, your bow directly ahead of you is what hit it, correct?

A.   Yes.

Q.   And you should be able to see directly ahead of you when you are operating a boat; is that correct?

A.   Yes.

Q.   And you have no idea why you couldn't see him?

A.   I believe I indicated in my deposition that I think there was - - the windshield frame might have created a blind spot.

THE COURT:    I'm sorry. Excuse me. You think what?

THE WITNESS:    The frame of the windshield is rather thick, and it may have blocked my vision at that particular hangover where the boat was coming from.

Tr at 174-178, 183, 187-188.

After the impact, Starito picked up Gregory out of water and took him over to his boat. In the boat his wife appeared to be unconscious by the driver's seat.

On cross-examination by the Delmarine counsel, Starito stated that in a photo, he could see damage to the port bow of the Fainer vessel, so that now - - unlike the time of the deposition - - he thinks that his port bow hit the Fainer boat at the port bow, which was not inconsistent with an overtaking situation. Starito also denied saying that he was

12

looking at gauges at the time of the impact, but instead stated that it "could have been sun glare" as an alternative reason for not seeing the Fainer vessel. (Tr at 212).

Ultimately, Starito conceded that at some point his boat was in contact with the port stern portion of the Fainer boat (Tr at 237) and that even if he was proceeding southeast, the Fainer vessel "would have the right of way." (Tr at 256).

Chris McGuirk testified on the part of Delmarine on the liability issues. He was the owner of Delmarine since 1998. McGuirk was a mechanic employed by Delmarine prior to the time he acquired the company. At the time of the occurrence, the Signa boat was for sale and Starito was bay testing the engine. The Signa boat was 18' long and weighed 2000 pounds. McGuirk testified that Starito's boat operating ability was exceptional; he was most qualified to test the boat; and he had no prior accidents. Further, he stated that the Signa boat was in excellent condition prior to the collision and afterward it was repaired and put back into use.

### B.    Discussion as to Liability

This case is controlled by admiralty law because the collision occurred in navigable waters and had a substantial connection to traditional maritime activities. *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996); *Moore v. Matthews*, 445 F. Supp 2d 516, 522 (D. Maryland 2006). In deciding when an activity bears a substantial relationship to "traditional maritime activity," the Supreme Court has held that even a boat docked for storage and maintenance was

13

engaged in traditional maritime activity. In *Sisson v. Ruby*, 497 U.S. 358, 362, 110 S.Ct. 2892, L.Ed.2d (1990), it was stated that "it is difficult to conceive of anything that a boat could do in the water which would not qualify as a traditional maritime activity." *Id.* at 363, 364; *see also Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d 1084, 1089 (2d Cir. 1993). In this regard, the claimant Linda Fainer has the initial burden of proving negligence on the part of Starito, the operator of the Delmarine boat. *See Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999); *In re Keys Jet Ski,* 893 F.2d 1225, 1230 (11th Cir. 1990); *In re Royal Carribean Cruises, Ltd.*, 85 F. Supp 2d 1367, 1370 (S.D. Fla. 1999).

In this case, "negligence under admiralty law is simply the failure to use reasonable care under the circumstances." *Moore* 445 F. Supp 2d at 522. Also, when two parties have contributed by their fault to cause damages in a maritime collision, such damages must be allocated between the parties proportionate to their comparative degree of fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Contributory negligence is not a complete bar to a plaintiff's recovery, but merely mitigates damages. *Exxon Co. USA v. Sofec, Inc.,* 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); *Stolt Achievement Ltd. v. Dredge B.E. Lindholm,* 447 F.3d 360 (5th Cir. 2006). However, in this case, the claimant Linda Fainer was a passenger and not the operator of the Fainer boat and there is no contributory negligence on her part. Therefore, liability in this case must be apportioned between Gregory Fainer and Michael

14

P-049

Starito.

The applicable navigational rules establishing the standard of reasonable care are set forth in 33 U.S.C. §§ 2005 and 2015, which read as follows:

> § 2005. Look-out (Rule 5)
>
> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.
>
> § 2015. Crossing situation (Rule 15)
>
> (a) Vessel which must keep out of other vessel's way
>
> When two power-driven vessels are crossing so as to involve risk of collision the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.

The facts in this case are relatively simple and substantially undisputed. Gregory was driving the Fainer vessel in an easterly direction in the channel leading to the Great South Bay, preparing to make a right turn into the Amityville cut on his way to Gilgo Beach. Linda was in the passenger's seat. Starito was bay testing the Delmarine craft and was heading south or southeast toward the port side of the Fainer vessel. At about 3:00 P.M. on that afternoon in June, it was broad daylight, the weather was clear and dry and visibility was very good. Strangely, neither operator saw the other boat prior to the impact. Starito did have a "snapshot" only at contact, but nothing before the collision.

The Court finds that Starito was negligent in the operation of the Delmarine boat

15

in failing to keep a "proper lookout" in violation of Rule 5. Further, his failure to keep a proper lookout was a proximate cause of the collision with the Fainer boat. The Court further finds that Starito was negligent in the operation of the Delmarine boat in failing to "keep out of the other vessel's way" in violation of Rule 15. Here, he was bearing down on the port side of the Fainer vessel and saw nothing and did nothing, permitting the Delmarine boat to crash with severe impact into the port stern side of the Fainer vessel. Negligence, causation and liability on the part of Starito and Delmarine is substantial and clear.

Having so found, the Court is of the view that Gregory is not entirely without blame. There he was operating his boat, having entered the channel in an eastbound direction. Heading right toward him on the port side is the Delmarine craft, with motor sounding in the usual audible manner. Obviously, during this time, Gregory never looked to the port at all. In the Court's view, that was a departure, albeit a limited departure, from the duty to exercise reasonable care.

## C. **Apportionment of Liability**

The Court having found that Starito, the Delmarine operator, and Gregory, the Fainer vessel driver, were both negligent which combined to cause this occurrence, the Court will now determine the question of apportionment.

In apportioning the Court must weigh the relative degree of fault as between the two operators, and determine as between those persons what part of the total fault shall be

16

apportioned to each by way of a percentage of fault for each. In making that determination, the Court will consider the duties owed by each of these parties and the question of whether the conduct of that party deviated from the duty that he owed, and weigh the relative degree of fault of each, expressed as a percentage of the total fault of both boat operators. Weighing all the facts and circumstances, the Court must consider the total negligence, that is, the negligence of both boat operators which contributed to causing this occurrence and determine what percentage of negligence is chargeable to each.

After reviewing the evidence, there is no doubt that the major responsibility for this occurrence is on Starito. For some reason, he steered the Delmarine craft forward directly into the port side of the Fainer vessel without seeing it and he did this in violation of the right of way of the starboard side vessel. On the other hand, a reasonable boat operator in the Great South Bay, with the substantial boat traffic in that body of water, also had a duty to keep a proper lookout.

After reviewing the facts and the law, the Court apportions the liability of the two boat operators as follows:

| | |
|---|---|
| Percentage of total fault apportioned to boat operator Michael J. Starito, Jr. | 85% |
| Percentage of total fault apportioned to boat operator Gregory Fainer | 15% |

17

**D.    As to the Injuries and Damages to Linda Fainer**

In this occurrence on June 9, 2003, Linda Fainer initially sustained the following

injuries:

        1. Cerebral concussion, which left her unresponsive for twenty minutes.

        2. Multiple rib fractures with chest wall deformity. There were fractures

to the second, fourth, fifth and sixth ribs on the left side; first, second, third, fourth, fifth,

sixth, seventh and eighth ribs on the left posterior side; and the right first rib anterior side.

        3. Bilateral pneumothorax (air in the chest wall).

        4. Left plural effusion with possible hemothorax (blood in the chest wall).

        5. Extensive subcutaneous emphysema.

        6. Comminuted and displaced fracture of the left clavicle.

At the Stony Brook University Hospital, Linda was given extensive medications

and had a chest tube inserted twice, causing severe pain. Linda was discharged after ten

days. Her family doctor referred her to Dr. Robert J. Lippe, an orthopedic surgeon. Dr.

Lippe testified that he first examined Linda on June 25, 2003, 16 days after the

occurrence. At that time, she was in mild distress and had an obvious deformity of the

left clavicle. X-rays revealed a comminuted mid-shaped fracture in the clavicle with a

"bayonet displaced" fracture. The bone was in four pieces. Also, she had multiple

displaced rib fractures. Dr. Lippe stated that these were painful conditions and there

could be no surgery to align the fractures of the clavicle. His initial diagnosis was "status

post fracture left clavicle and multiple rib fractures." He prescribed conservative treatment because surgery would be dangerous.

Dr. Lippe continued to treat Linda. On August 18, 2003, x-rays showed scant callous formation. Healing was not going as fast as he expected and he ordered an Exogen Bone Stimulator, an electronic device to stimulate bone healing. Linda continued to have pain and disability in the left shoulder and ribs. On September 10, 2003 a diagnosis was made of a frozen left shoulder caused by pain, which was treated by a cortisone injection into the left shoulder joint, medication and physical therapy. On October 17, 2003, x-rays suggested some healing of the left clavicle fracture but not as much as Dr. Lippe expected.

Dr. Lippe further testified that on December 3, 2003, he was of the opinion that Linda had an established non-union of the left clavicle, and there was not more he could do to treat the condition. By October 8, 2004, Linda's left clavicle was showing only "questionable early healing." The healing left the bones in less than perfect alignment. On the November 18, 2004 visit, Linda had continued pain in and around the scapula and chest. The pain was no longer localized to the clavicle. Dr. Lippe indicated that these symptoms could be a sign of a condition known as reflex sympathetic dystrophy ("RSD").

During this period and afterwards, Linda was being treated with physical therapy. On a May 5, 2006 visit to Dr. Lippe, almost three years post-accident, Linda had

19

P-049

complaints of persistent pain in the left shoulder and he noted the obvious deformity in the left clavicle. X-rays revealed a displaced mid-clavicular fracture. The bone was healed not in perfect alignment. On May 17, 2006, Dr. Lippe found that Linda "exhibits a permanent loss of 50 percent use of the left arm based on restricted movement and pain." (Tr at 689). On November 8, 2006 Linda was experiencing burning pain and numbness in the right foot. After being referred back to him by Dr. Charles E. Argoff, Dr. Lippe examined Linda and made a diagnosis of reflex sympathetic dystrophy in the right foot and chest area, even though until May 2006 he never even suggested RSD, much less made such a diagnosis. (See Tr 719). Dr. Lippe testified that RSD is a permanent condition that can debilitate a person for life. As to her capacity to work, Dr. Lippe testified:

> Q. Doctor, based on your opinion, is Mrs. Fainer able to return to work?
>
> A. No.
>
> Q. Can she even work part-time where she has a fixed schedule, where she has to work so many hours a day, each day?
>
> A. No.

Tr at 692.

On cross-examination of Dr. Lippe, it was brought out that Linda had no complaints of pain in her right foot for more than three years after the occurrence. Further, he did not see three of the four specific requirements for an RSD diagnosis with

20

regard to Linda's right foot, and on redirect he seems to have contradicted this testimony. Also, he did not review all of the four factors underlying a diagnosis of RSD with regard to her left shoulder and back. In addition, Dr. Lippe conceded that Linda had no problems with the healing of the ribs and she "should not have any defects from the healing of the ribs" (Tr at 703); nor should she have any difficulty with the ribs as the rib fractures healed. Also, from December 2003, when Linda advised him she was pregnant, to July 2004 when she gave birth, no pain medication except Tylenol was prescribed for Linda. Dr. Lippe also testified that pregnancy puts a lot of stress on the female body and likely would magnify any problem that Linda had. The same conditions would be true during her second pregnancy prior to January 2006, when Linda gave birth to her second child. In addition, Dr. Lippe was not aware that between 2003 and 2006, Linda continued her employment with Kaufman Management Co.

A major medical figure in this case is Dr. Charles E. Argoff, a board-certified neurologist with a sub-specialty board certification in pain management. At the time he examined Linda, Dr. Argoff was in the Pain Management Center at the North Shore University Hospital. Presently, he is a Professor of Neurology with the Albany Medical College and the Medical Director of the Comprehensive Pain Center at Albany Medical Center. He has written extensively on pain and pain management and has received a number of grants in this area. In particular, he wrote and published a book on reflex sympathetic dystrophy, which is a complex regional neuropathic pain syndrome, that he

21

defined in detail.

Dr. Argoff explained that RSD is an older term used to describe what is now known as complex regional pain syndrome, or neuropathic pain syndrome. Dr. Argoff stated that there are four specific criteria used to make the diagnosis of RSD. Initially, there must be an inciting or noxious event causing injury. Then the first symptom of RSD is the presence of hyperalgesia, a condition where pain in the affect area is dramatically worse than what would usually be expected. Second, is the presence of allodynia, which Dr. Argoff described as a sensation ranging from noticeable to dramatically painful in response to stimuli that should not be painful at all, such as touching or blowing on the skin. The third criteria is swelling, excessive sweating, or excessive hair growth. Finally, the fourth criteria is that there is no other explanation for this condition. (*See* Tr at 266-268).

On October 9, 2006, Linda became Dr. Argoff's patient, having been referred by Dr. Peter A. Kechejian of the North Shore Pain Service. Dr. Argoff obtained a history of this boating accident in 2003 and her multiple injuries and fractures. Linda had complaints of severe left sided rib and scapula pain; left paracervical burning pain and more recently pain in the right foot. His examination revealed severe pain behind the left shoulder and mid-thoracic spine with severe neuropathic pain, known as allodynia; which is a condition painful to touch indicative of a nerve injury. He noted that Linda had no findings on the right side of her body.

22

Dr. Argoff's diagnosis of Linda's condition at that time was "CRPS type one, or complex regional pain syndrome type one, which is known and what you have said is RSD" (Tr at 293). Dr. Argoff reviewed the four criteria for RSD and found that Linda's condition conformed to each criteria. Dr. Argoff saw Linda again on December 4, 2006, and she continued to demonstrate signs of CRPS. Dr. Argoff explained how RSD affected a patient.

> Q.  All right. Now Doctor, what you - - you explained what RSD is. How does it affect a patient? How serious is it, and what kind of treatment is there?
>
> Can you talk about that?
>
> A.  Nerve injury pain of any type, but especially certain conditions like RSD, can be a horrific experience, because the pain never goes away. It can be very life-changing, very disabling, very impairing and very misery-provoking.
>
> Q.  And is there any treatment or cure for RSD?
>
> A.  There is no known cure for RSD at this time.
>
> Q.  Does RSD - - the area tend to contract or expand over time?
>
> A.  The normal course of the nervous system is in an area of nerve injury, that the area expands, not contracts.

Tr at 303-304.

After Linda's third visit to his office on December 21, 2006, at which time he again diagnosed RSD, Dr. Argoff left his position at North Shore. As to his prognosis, Dr. Argoff stated that "someone who is still experiencing as severe pain as Linda has,

23

four years after an injury, despite attempts to treat, is more than likely going to continue to have pain for the rest of his or her life, potentially and regrettably, at times, disabling pain." (Tr at 309-310).

As to Linda's ability to return to the work she previously did, Dr. Argoff stated that she could not return to that kind of work for several reasons: (1) "physically, her condition will prevent her from doing this, in all likelihood" and (2) "the type of medication and treatment that she received in the past may limit her ability to complete this task or other tasks as well." (Tr at 311-312). Also, with regard to the RSD, Dr. Argoff stated that some days are better and some are worse and Linda could not guarantee an employer that she will be there every day.

On cross-examination, Dr. Argoff acknowledged that Linda came to court every day; apparently takes care of her two small children; that her condition varies from day-to-day; and that her condition is unpredictable. However, he said that pain itself is a disability. Further, shown the report of Dr. Roger Bonomo, the physician who examined the plaintiff for Delmarine, he agreed with some of his findings including: there are no problems in Linda's gait; her cranial nerves 2 to 12 are normal; there is no muscle atrophy; her muscle tone is normal; her reflexes are active and equal; and her straight leg raising is normal. Dr. Argoff also acknowledged that Linda worked from shortly after the date of the accident until August of 2006 when "Her pain became more unbearable." (Tr at 366).

24

P-049

Dr. Argoff was questioned regarding his report dated December 21, 2006 (Claimant's Exh. 32). In that report he stated that Linda's pain level is "8 out of 10. She has findings which are clinically consistent with a CRPS Type 1, also known as RSD, type of syndrome." In the report, he added that "As I observed her today she was however quite active with her children and she does her best to remain as functional as possible." In his report, Dr. Argoff also stated that Linda's pain in her right foot was related to her underlying CRPS. Asked directly whether Linda is fully and permanently disabled, Dr. Argoff answered equivocally:

Q. As you sit here today, is Ms. Fainer fully and permanently disabled?

A. Can you define for me what - - I can't answer the question the way you've asked it. I'm sorry.

Q. Do you anticipate in the near or distant future that Ms. Fainer will need any type of permanent care, whether it's in a permanent care facility or a home?

A. She might.

Q. And for what would she need that permanent care?

A. As I stated earlier in my testimony, unfortunately, conditions like CRPS can worsen without any specific additional provocative factor, unfortunately.

So should her condition deteriorate, she could quite practically, and more than just theoretically, require additional and much more formal help to assist her in her daily activities.

Tr at 395, 396.

Also, curiously in view of these injuries, Dr. Argoff testified that Linda's gross cognitive functions were normal.

> Q. Did you ever examine Ms. Fainer for any type of reduction in cognitive ability or thinking ability as a result of the medication?
>
> A. In October of 2006, as part of her unusual neurological examination, she was – she underwent what is typical of an electrical examination, a test of higher cortical function. And it's summarized in the area called neurological examination in the first three lines.
>
> So I'll read it to you. 'Revealed that she is alert and fully oriented to person, place and time. Higher cortical function, including speech and language function, are grossly intact.'
>
> Q. What does that mean to you?
>
> A. That means at the time I examined her, on that day, her gross cognitive functions were normal, or what we consider in a normal range. Granted that that was the first time I saw her. And for her – although she may be in a normal range, clarifying my response, when someone is within normal limits doesn't mean that it is normal for that person.
>
> Q. Did your observation of her on October 9th of 2006 suggest to you that you had to do any further testing in that regard?
>
> A. In that regard, no.

Tr at 351-352.

Dr. Argoff was questioned about the fact that Linda gave birth to two children after the accident. He stated that these births could have exacerbated her condition, but the cause of the RSD was the accident.

Dr. Padmaja Aradhya, a board certified neurologist, first examined Linda on April

17, 2006, having been referred by Linda's primary care physician. Dr. Aradhya's physical examination revealed a "sensory loss in stocking and glove pattern" with "dyesthetic sensations in the left side of the upper back, clavicular area, anterior chest wall and thoracic area." (Claimant's Exh 31). However, the EMG, MRI and other tests were all normal.

Dr. Aradhya defined RSD as a "pain syndrome when it usually starts out after an injury. The pain is beyond the inciting injury . . . It doesn't follow any anatomical pattern." (Tr at 513). She stated that this condition is caused by inflammation in nerves which do not heal in a normal manner, causing a very painful condition. Dr. Aradhya testified that as of the August 7, 2006 visit, Linda did not clearly have RSD at that time, but she had features of a neuropathic pain state. However, after tests performed by Dr. Argoff, she did come to a diagnosis of RSD even though she did not test her for all the criteria, and multiple medications were prescribed for her.

On June 5, 2007, her examination revealed that Linda's dyesthetic sensation and the symptoms and signs had spread from the initial site. Dr. Aradhya again noted that her diagnosis was RSD. Linda was in pain, depressed and tearful. She did not derive much relief from the medications, which she had been taking since 2003. It was Dr. Aradhya's opinion that the cause of the RSD was the trauma from the boating accident of June 9, 2003. (Tr at 525-526). As to the future, Dr. Aradhya testified that the prognosis is poor "because patients with RSD are quite refractory to treatment." (Tr at 526).

27

On cross-examination, Dr. Aradhya conceded that Linda's condition does not fit all the criteria of RSD. In fact, she stated that she did not test Linda for all the criteria. She made a tentative diagnosis of CRPS and referred Linda to Dr. Argoff who confirmed the condition by his testing. Her testimony as to RSD was decidedly uncertain:

Q. My question was – perhaps you did not understand it – other than the test results of Dr. Argoff, for which no records have been produced, including when Dr. Argoff was present here, he didn't have those records. Other than that, is there any clinical way that your examination or treatment of the plaintiff establishes that she meets all four criteria for complex regional pain syndrome?

A. Not all four. Not through clinical examination.

Q. Would you agree with me, Doctor, unless a patient reaches all four areas satisfactorily, there cannot be a diagnosis of complex regional pain syndrome?

A. In absolute terms, yes.

Tr at 556.

Further, Dr. Aradhya conceded that Linda has no motor or cognitive defects; has no difficulty walking; has no stiffness or atrophy in the joints; and, other than pain, has no symptoms such as loss or restriction of motion. In addition, she testified that Linda had no nerve damage, which was confirmed by all the objective testing, including EMGs.

The final physician in the claimant's case was Dr. Mitchell F. Banks, who appeared by video deposition on July 23, 2007. Dr. Banks is a board certified psychiatrist. He first saw Linda on September 14, 2005 having been referred by her

28

family physician. Linda was having some problems due to the "injury to the back" in the boating accident and also some marital problems and issues with her husband's ex-wife. Dr. Banks found that Linda had symptoms consistent with depression, feeling very frustrated, some sadness and change in her overall level of functioning.

Dr. Banks diagnosed Linda's condition as an "adjustment disorder" as a result of her pain secondary to the accident and her marital problems. Her primary problem was decreased functioning after her accident. His recommended treatment was psychotherapy. Dr. Banks next saw Linda one year later on October 17, 2006. She was more depressed, had crying spells and was on various medications. Also her pain had increased and she had additional impairment of functioning. His diagnosis at that time was that she was having a major depressive episode, single and moderate. He again recommended psychotherapy and medication called Cymbalta. However, Linda apparently did not undergo psychotherapy. He saw Linda again November 14, 2006 and she was feeling better. At that time he added another medication called Provigil, to improve Linda's energy level.

Linda visited Dr. Banks a number of additional times with her last visit prior to his deposition being on June 27, 2007. At that time "she was feeling very overwhelmed" and complained of much more pain, and he added another medication. During these visits he saw no sign of "secondary gain" or "malingering on her part." As to Linda's ability to work, Dr. Banks stated that in his opinion "I don't think she could work right

P-049

now." He also opined that the primary cause of her inability to work was "the pain from the accident."

The claimant Linda Fainer testified that she was born on October 9, 1964. Therefore, she was 38 years of age at the time of the occurrence, and she is now 43 years old. She is married to Gregory and has two small children of her own and two older stepchildren. At the time of this occurrence Linda was working as an officer manager of a private equity fund called Media Ventures ("the Fund"). She had been working for this firm since December, 1988. In that position she was in charge of payroll, the tax returns and the audits. She would also do the books, including the general ledger and payroll. In that capacity she was familiar with the word processing program and the firm software. Linda worked at 30 Rockefeller Plaza in Manhattan. Her hours were 9:00 A.M. to 5:00 P.M. She left her home in Seaford at 7:00 A.M. and was home by 6:30 P.M. Linda loved her job and her annual earnings were a little less than $100,000.

The Fund started to wind down in 1998, which operation extended to 2002. By January 2003, Linda was working part time from her house. At the time of the accident she was working three days a week at home at an annual salary of $50,000. However, Linda stated that if there were no accident she would have returned to work full time as of September 2003.

In April 2000, Linda married Gregory. It was her first marriage and his second. She wanted to have children early in her marriage but was not able to conceive before the

30

accident. Even with children, Linda was going to continue to work. She and Gregory bought an expensive home on the water and needed her income, which was twice what Gregory earned. After the occurrence, they were not able to keep the house, which was sold.

Linda has no recollection of any event on the day of the accident. Her first recollection was June 10, 2003, the day after the accident, when she was in an elevator in the hospital, throwing up. When she became conscious she was in constant pain; relieved somewhat by medication. She stated that the pain was like a burning knife in her chest, every time she took a breath. Moving and breathing made it worse. There was a tube in her chest, which was painful. Linda was discharged from the hospital on June 18, 2003. She was given a breathing device which was so painful she stopped using it. She was on medications, which did not entirely relieve her pain. The first doctor she saw was Dr. Vincent Anzalone, her primary care physician, who referred her to Dr. Robert Lippe, an orthopedist. She was started in physical therapy, which involved gentle exercise, and was also very painful. In July 2003, Linda developed "pins and needles" in her hands and right foot.

During June and July 2003, following the accident, she did not work but Kaufman Management, the firm that managed Media Ventures, paid her for three days a week. At some point Linda was able to do some work on the computer on an "as-needed basis." However, she testified that her medications adversely affected her ability to concentrate

31

and work.  In December 2003, Linda found out she was pregnant.  It was a "total shock."

She was told to and did suspend all narcotics, which resulted in more pain for her.  Her

husband, mother and sister were always in the house helping out.  In July 2004, Linda

delivered a daughter, Ashley, by C-section.

During this period and afterward, Linda went to an acupuncturist, an osteopathic

physician and a chiropractor but nothing alleviated the pain.  She discussed having

surgery on her "cracked clavicle" with Dr. Lippe and another orthopedist and was advised

against surgery and told to seek help from a pain management physician.

Linda sought other medical help and visited various doctors, finally going to the

Pain Management Facility of North Shore Hospital in Syosset, where she received trigger

point injections and narcotic medication for her pain.  Linda stated that the drugs made

her light headed and nauseous but did not relieve her pain.  Her mother, father and sister

helped her with her children.  Also, during this time there was a strain on her marriage,

including her step children and her husband's ex-wife.  Linda and Gregory went to

marriage counseling and then she started seeing a psychiatrist, Dr. Banks, who she is still

seeing.

Linda began seeing Dr. Aradhya in April 2006 and is still seeing her.  She was

also referred to Dr. Argoff at North Shore Pain Management.  He taught her to try to

manage her pain.  Treatment with Dr. Argoff terminated when he left the practice.  As to

employment, Linda testified that she tried to resume working for a "friend" as an office

32

manager, part time, but after a month or two she could not continue; the pain was "very bad at the end of the day. And it kept getting worse" (Tr at 776). The Court notes that the name of the "friend" or his company was not disclosed.

With regard to her life today, Linda testified that she takes six medications daily and an additional medication from time to time. She is in pain in the back of her left shoulder, back, her right leg and left side which affects her walking. With the pain, she was not able to wear a bra. This compelled her to undergo breast reduction surgery for her own self-esteem. The multiple medications affect her ability to concentrate and to use the computer. On a "good day" she can sit at the computer for two to three hours. No employer other than her friend Diane Kaufman, the owner of Kaufman Management, would permit this kind of restricted work and she ended part time work for Diane in August 2006.

Financially, her life is totally changed. She and Gregory had to sell their "dream house" on the water and move to a cheaper home in North Massapequa. Before the accident she participated in many activities such as entertaining; skiing four to six times a year; bike riding; roller bladeing and long walks together with Gregory. Also, she "loved" to dance, play tennis and horseback ride. After the accident she did no dancing, skiing, tennis playing, bike riding or roller bladeing. As for her disposition, Linda testified that it has changed and it now "rhymes with rich." However, Linda was and still is able to drive. Linda did not plan on having another child but became pregnant again in

33

the Spring of 2005 and had her second child on January 25, 2006.

On cross-examination, Linda stated that in 2002 Ms. Kaufman told her that the Fund would end on December 31, 2002. Some time in 2003 her job would be converted into a part- time position at a lower salary, namely reduced by one-half. Even after the accident she worked for Diane Kaufman to August 20, 2006. Also, in 2003, Linda received benefits from a profit sharing plan in addition to her salary from Ms. Kaufman.

Diane Kaufman operated the private equity fund known as Media Ventures L.P. She hired Linda as the office manager. Linda prepared the financial reports, paid the bills, did the general bookkeeping, prepared the tax returns and dealt with the 35 investors. She also worked with the computer and the word processing. Linda earned about $100,000 a year from the mid 1990s to the year 2002, when the fund was liquidated. From 2000 to 2002, Linda's W2 forms revealed income of $95,000, $88,500 and $96,999, including salary, bonus and profit sharing. Ms. Kaufman testified that Linda performed her job extremely well.

In May 2003, the Fund was winding down and moved its office from 30 Rockefeller Plaza to Ms. Kaufman's apartment in Manhattan. Linda was to work at home on a part time basis. After the accident, after a hiatus to recover, Linda was working at home part time and was paid "roughly" $50,000. At the end of 2003, Linda was to seek other employment. Prior to the accident Linda was "tremendously energetic" and "had great stamina". During the period after the accident, Ms. Kaufman noticed that Linda's

34

ability to do things changed. She was in pain and could only work for a couple of hours each day. She lacked energy and stamina. In 2004, Linda's work was reduced to two days a week while the Fund was in liquidation, because of a reduced work load. The last time Linda was paid by the Fund was in August 2006.

David DeLucia testified by telephone. He first met Linda Fainer at Goldman Sachs where he was a partner and she was his secretary in the late 1980s early 1990s. During that period he observed Linda every day. For 16 years at Goldman Sachs he had six or seven secretaries and he ranked Linda "right at the top." In his words "she was a very, very conscientious worker. She was a superb typist, great with people, really hard working. I would rate her very high, if not the best secretary I ever had" (Tr at 622). He conceded, however, that he did not know Linda's job skills in the last ten to fifteen years.

Irene Galvin is the sister of Linda Fainer. She helped her sister for three days a week after Linda's first pregnancy. Irene cooks meals, takes care of the girls and does the shopping. Irene described Linda's condition. In the afternoon Linda's pain level increases, her face becomes tense and her conversation almost monotone. In addition, on occasion she goes to her bedroom and cries. Prior to the accident Linda was her support. She was gregarious and took care of her, her mother and their brother; after the accident they take care of her.

Mary Patricia Horne is Linda's mother. After the June 9, 2003 accident she saw Linda that first day in the hospital, hooked up to an IV with a tube in her chest draining

35

her lungs. She assists Linda at home four to five days a week for three to seven hours a day. She sees Linda in pain. In the morning, after she takes her pills, Linda can function for three or four hours and can take care of the children. After the morning hours, her pain increases, she grimaces, holds her left side and occasionally cries. This occurs two or three times a week. According to Mrs. Horne, before the accident, Linda was vivacious, biked and enjoyed sports. After the accident, there were no sports for her and she does not socialize. However, Mrs. Horne conceded that Linda worked part-time after the accident and that she drives to her house with the grandchildren and occasionally she drives to her doctor appointments.

In the Delmarine case, two doctors were produced. Dr. Roger Bonomo, a neurologist, experienced in pain management, was retained by Delmarine's counsel to examine Linda Fainer, which he did on June 4, 2007. Prior to the examination he was provided with her medical records. Linda's complaints included pain in the middle of the back toward the left side and left shoulder, which increased with activity and decreased with rest and medication. She also complained of stabbing pain in the right foot, with pins and needles sensation in the right foot and right hand and memory problems.

Dr. Bonomo conducted a neurologic examination and an examination for RSD. Among his findings were that Linda had normal cognitive functions without any deformity; her spelling ability and memory were normal; she walked normally; there was a negative Romberg test; her head and neck moved normally and without pain; the 12

36

cranial nerves and her reflexes were normal; she had normal strength in her upper and lower limbs; and she had normal reaction to stimuli. He did find tenderness in the left clavicle in a deformed area and a scar in her left chest. Dr. Bonomo testified that other than tenderness in the left side and shoulder, all the other tests were normal.

Dr. Bonomo rendered his medical opinion as to the diagnosis of RSD and her alleged inability to work, as follows:

> Q. You had the opportunity to perform an examination of Mrs. Fainer. Based upon your examination, do you have an opinion as to whether, at the time you examined her in June 4, 2007, she suffered from complex regional pain syndrome?
>
> A. I do.
>
> Q. Could you tell the Court what that opinion is?
>
> A. I do not think she has complex regional pain, which does not mean that I don't think she has pain. She just does not have that syndrome of complex regional pain by my finding on examination or by the records I have seen.
>
> Q. Could you tell the Court why you believe your opinion is that she does not have complex regional pain syndrome?
>
> A. To put it the other way, I would conclude that she had complex regional pain if she had some or all of the features of avoidance of use of the area that is painful.
>
> If someone has complex regional pain in an arm, for instance, if they avoid using that arm completely, keep it immobile, keep it protected, that is one of the features.
>
> If she had the atrophy and the changes in that area that go with avoiding use of it, that would be supportive of the syndrome. Does not always include autonomic nervous system changes like pallor or discoloration,

37

increased sweating or loss of hair growth, but those features, if present, would make me think she had complex regional pain with the autonomic disturbances that can accompany it.

In the absence of those findings, just noting that she is tender and is sensitive enough in the area so that she avoids wearing a bra, that is not enough to call it complex regional pain.

Q.   Thank you, Doctor.

Based upon your review of the plaintiff's condition and her records, is there anything in your examination that would support a finding that Dr. Argoff made that she is unable to work in any capacity at this time?

A.   No.

Q.   It's not clear from the history that you took, but it may very well be in many of the records. Ms. Fainer worked, prior to the accident, indeed, for - - at least on a part-time basis, because it was part-time before the accident, as an office administrator.

Is there anything in her medical condition that you observed that would prevent her from being an office administrator?

A.   No.

Q.   Would that be on a full-time basis or just a part-time basis?

A.   Full-time she should be able to, according to what I found on examination, yes.

Tr at 465-467.

On cross-examination, it was revealed that Dr. Bonomo, who testified numerous times on behalf of defendants in personal injury suits, has no pain management certification, has not published in that field, and he is not a specialist in pain

38

management. His last work in a pain clinic was in the late 1980s and early 1990s. On the other hand, Dr. Bonomo acknowledged that Dr. Argoff is a pain management specialist; has published extensively in that field and has more experience in that field. Dr. Bonomo also conceded that Linda sustained significant multiple fractures and injuries. Also, he stated that pain itself can be debilitating and can prevent a person from working. Dr. Bonomo also conceded that pain, swelling and sensitivity can be symptoms of RSD and that these conditions and taking medications can interfere with her working. He further stated that although there is no cure for RSD, some people recover from the condition without treatment.

Dr. Maurice Carter, an orthopedic surgeon, was asked by Delmarine to examine Linda Fainer, which he did on June 4, 2007. Dr. Carter testified that after reviewing Linda's records, that the diagnosis of RSD does not rest on strong anatomical criteria. He does not find evidence of RSD in her upper extremities. In his opinion, further tests should be done before the diagnosis is made.

In his physical examination, Dr. Carter found that Linda had pain in the left collar bone, back and below the shoulder bone and into the armpit, with pins and needle sensation into the upper palm and fist. She had restricted motion of the left arm but no visible atrophy. After his examination, Dr. Carter stated that he doubted "in very strong terms that Ms. Fainer had reflex dystrophy." He noted that she has been taking OxyContin, a powerful narcotic, at a rate of up to eight per day, which is dangerous, and

39

she should seek another opinion as to that drug. While he found a 50% restriction of motion on the left side, he stated that "this was done by the patient activity" (Tr at 581) and he did not pursue this further because he didn't want to be accused of producing undue pain. The prior MRI of the left shoulder was reported to be a negative study and her rib fractures have healed. Dr. Carter observed that her left clavicle healed with some "clavicular bayonet opposition," meaning it cannot straighten and it is offset to some degree.

Dr. Carter does not believe that Linda has complex regional pain syndrome type one because she does not meet all four of the criteria. Dr. Carter also stated that in his opinion, Linda "could go back to being an office manager to the same degree she performed it prior to this boating accident." (Tr at 588).

On cross-examination, Dr. Carter stated that 99% of his examinations are for defendants in personal injury cases. Further, he conceded that a neurologist, not an orthopedist would treat RSD. Also, he does not practice pain management, nor does he treat patients for that condition. In addition, Dr. Carter testified that Linda had a significant trauma "which was at the outset life-threatening, certainly with collapsed lungs" (Tr at 599), with multiple rib fractures on the order of 14 fractures, a flailed chest, a commuted and displaced fracture of the left clavicle, and was knocked unconscious; a significant trauma.

40

### E. Discussion as to Injuries and Resulting Damages

#### 1) As to Injuries and Pain and Suffering Incurred to the Present Date

In this collision of motor boats, claimant Linda Fainer suffered very serious and potentially life-threatening injuries. Rendered unconscious for about thirty minutes with a severe concussion, she also sustained multiple rib fractures, a displaced fracture of the left clavicle with permanent bayonet type displacement, bilateral pneumothorax (air in the chest wall), left pleural effusion with possible hemothorax (blood in the chest wall) and extensive subcutaneous emphysema.

After a review of the evidence, the Court finds that Linda made a fairly good recovery from these multiple severe injuries. However, she is left with a number of serious residuals. First, there is the permanent displaced fracture of the left clavicle. Second, the serious sequellae of these multiple rib fractures and the displaced fractured clavicle, which resulted in severe continuing pain in the left shoulder and back area, and the problems such continuing pain would cause. As to the claim that Linda has RSD, the Court finds that the claimant failed to prove that she has this condition. It appears to the Court that there is some speculation and uncertainty in the diagnosis and treatment of RSD. In addition, there is evidence that further tests are required in order to confirm that Linda suffers from RSD.

As to the award of damages, a review of the precedents is always helpful. In *Rangolan v. County of Nassau*, 370 F.3d 239 (2d Cir. 2004), the plaintiff, an inmate with

41

a long-term prison sentence, sustained a severe brain injury and a depressed fracture of the skull requiring emergency brain surgery. He was in a coma for six days and had and will have seizures; resulting in a personality disorder. The jury verdict of $300,000 for past pain and suffering was affirmed by the Second Circuit. *Id.* at 245-46. In *James Jansen v. C. Raimondo & Son Construction Corp.*, 293 A.D.2d 574, 741 N.Y.S.2d 71 (2d Dep't 2002), the plaintiff, an ironworker, sustained a subluxation in his right shoulder, a dislocation in his left shoulder, fractures to his left humerus and left clavicle, and bilateral carpal tunnel syndrome after falling from a ladder. In connection with the injuries to his shoulders, he underwent two surgeries and 14 months of occupational therapy. According to the plaintiff, he experienced continuing pain, had difficulty sleeping, and could no longer engage in activities which he formerly enjoyed. A doctor who examined him testified that he would need additional occupational therapy and will require surgeries in connection with the continuing bilateral carpal tunnel syndrome. Held, the award of $350,000 for past pain and suffering constituted reasonable compensation. However, the Court found that the award of $730,000 for future pain and suffering was excessive and reduced it to $400,000. *Id.* at 575.

In *McKithen v. City of New York*, 292 A.D.2d 352, 738 N.Y.S.2d 856 (2d Dep't 2002), the plaintiff was stabbed in the back and suffered from post traumatic stress disorder. An award of $400,000 for past pain and suffering was affirmed. More recently in *Conley v. City of New York*, 40 A.D.3d 1024, 837 N.Y.S.2d 702 (2d Dep't 2007), the

42

plaintiff suffered a comminuted inter-articular fracture of the radius of the right arm requiring surgery and the permanent insertion of a metal plate and screws resulting in a permanent disability and traumatic arthritis. An award of $14,000 for past pain and suffering was increased to $125,000. In *Smith v. Crown Lift Trucks*, No. 84 CV 2866, 2007 WL 1467970 (S.D.N.Y. May 16, 2007) the plaintiff sustained a seriously injured foot and will have difficulty walking for the rest of his life. A jury award of $1,026,000 was reduced to $500,000. *See also Hoerner v. Chrysler Fin. Co.,* 21 A.D.3d 1254, 1255-56, 802 N.Y.S.2d 583, 585 (4th Dep't 2005) (reducing award of $375,000 for past and $1,000,000 for future pain and suffering to $250,000 each where the plaintiff suffered from pain and will require future surgeries due to degenerative changes, but was not totally disabled, was able to walk without a limp, and had a functional, though imperfect, patella.

A decision of added interest in this case is *Nassour v. City of New York,* 35 A.D.3d 556, 828 N.Y.S.2d 110 (2d Dep't 2006). In Nassour, the plaintiff tore the medial meniscus cartilage in his knee and, as a result, received arthroscopic surgery and a high tibial osteotomy. Following the high tibial osteotomy, the plaintiff experienced pain, burning and numbness in his right foot, which was diagnosed as reflex sympathetic dystrophy, RSD. The plaintiff's RSD was permanent and chronic, yet the Court reduced the jury verdict for past pain and suffering from $800,000 to $500,000.

For all the injuries and the pain and suffering sustained by Linda Fainer to the

43

present date, the Court awards the sum of $750,000.

## 2) As to Pain and Suffering in the Future

Two of the treating doctors produced by the claimant, namely Dr. Charles Argoff and Dr. Padmaja Aradhya have testified that the pain Linda is experiencing will be permanent. The Court accepts this testimony. Again, the Court looks to the cases.

In *Taveras v. Manhattan and Bronx Surface Transit Auth.*, 41 A.D.3d 158, 837 N.Y.S.2d 120 (1st Dep't 2007), the jury declined to award any damages for future pain and suffering in a case in which the plaintiff was struck by a bus and seriously injured. The plaintiff had an extensive hospitalization and multiple surgical procedures with permanent residuals. Held, an award of $400,000 for future pain and suffering was reasonable compensation. In *Rosenberg v. Aeschliman*, No. 02 CV 7922, 2004 WL 1252951 (S.D.N.Y. June 7, 2004), the plaintiff sustained a fracture of the second cervical vertebrae with post traumatic changes causing permanent pain and stiffness. Held, $175,000 was reasonable compensation for both past and future pain and suffering. *Id.* at *4.

Again in *McKithen*, after having been stabbed in the back, the plaintiff continued to suffer from post-traumatic stress disorder. A jury verdict of $880,000 for future pain and suffering was reduced to $500,000. *McKithen*, 292 A.D.2d at 353, 738 N.Y.S.2d at 857. A similar sum was approved by the Second Department in *Ramirez v. City of New York*, 279 A.D.2d 563, 719 N.Y.S.2d 289 (2d Dep't 2001) a case in which the plaintiff

44

sustained permanent brain damage. Again, the analogous case of *Nassour v. City of New York*, in which the plaintiff sustained a severely injured knee and foot requiring surgery and resulting in a condition of RSD involving permanent pain, burning and numbness in his right foot is instructive here. A jury award of $1,712,500 for future pain and suffering was reduced to $1,000,000. Also, in *Rangolan*, a case which involved brain damage, continuing leg and back pain and headache, a long scar on the head and face, depression and the permanent prospect of seizures, this Court reduced the award for future pain and suffering from $1,250,000 to $500,000. That reduction was affirmed on appeal. *Rangolan*, 370 F.3d at 246-247. The Second Circuit referred to several other cases involving future pain and suffering. *See, e.g., Lauter v. Village of Great Neck*, 231 A.D.2d 553, 647 N.Y.S.2d 524 (2d Dep't 1996) (an award of $700,000 was reduced to $500,000 for serious arm and chest wounds, shattered jaw, facial lacerations, and nerve damage resulting in partial paralysis and disfigurement of the face); *Bartlett v. Snappy Car Rental, Inc.*, 214 A.D.2d 596, 626 N.Y.S.2d 499 (2d Dep't 1995) (an award of $350,000 was reduced to $250,000 for severe headaches and tremors that prevented the plaintiff from leading a normal and active life).

Recently, in *Brown v. Elliston*, 42 A.D.3d 417, 840 N.Y.S.2d 96 (2d Dep't 2007), the plaintiff sustained comminuted fractures of the shafts of the tibia and fibula and was in a hard cast for nine months. He then underwent surgery involving the insertion of a metal rod down the length of his shin affixed with two screws. This resulted in

45

permanent pain, scarring and a limp. However, he was able to perform many of his pre-accident activities. The jury award of $500,000 for future pain and suffering was reduced to $400,000.

For the pain and suffering to be sustained by Linda Fainer in the future, the Court awards the sum of $500,000.

However, this sum must be reduced to its present value. *See Grace v. Corbis Sygma, et al.,* 487 F.3d 113 (2d Cir. 2007); *Oliveri v. Delta,* 849 F.2d 742, 751 (2d Cir. 1988) ("We have concluded that the appropriate course is to accept the concept of discounting awards for non-pecuniary losses, but to forgo the precision appropriate for discounting future earnings. . . . That should be done by the same fact-finder that determines the amount of the award, without any precise mathematical adjustments."); *Estevez v. United States,* 72 F. Supp. 2d 205, 211, 214 (S.D.N.Y. 1999). (In a Federal Tort Claims Act case, the damages award for future pain and suffering was reduced by a discount rate of 2% per year, for a maximum of ten years pursuant to New York Law); *see also* N.Y. C.P.L.R. 5041(e) ("[T]he period of time used to calculate the present value for damages attributable to pain and suffering shall be ten years or the period of time determined by the trier of fact, whichever is less.").

Therefore, the attorneys are requested to compute and relate to the Court their view of the reduction to present value of this future pain and suffering award. They are directed to present their computation to the Court in no more than a two page letter within

46

ten (10) days of the date of this decision.

### 3) As to Past Loss of Earnings

The claimant Linda Fainer had the burden of establishing damages for past and

future lost earnings with reasonable certainty, focusing in part on her earning capacity

both before and after the injury. *Bacigalupo v. Healthshield, Inc.*, 231 A.D.2d 538, 539,

647 N.Y.S.2d 32 (2d Dep't 1996); *Calo v. Perez,* 211 A.D.2d 607, 608, 621 N.Y.S.2d

370 (2d Dep't 1995).

In this case, even though the claimant's tax returns were admitted in evidence,

they failed to establish, with reasonable certainty, Linda's damages for loss of earnings.

*See, e.g., Karwacki v. Astoria Medical Anesthesia Assocs.*, 23 A.D.3d 438, 439, 808

N.Y.S.2d 123 (2d Dep't 2005) ("Even assuming that the plaintiff's tax returns were

properly submitted in evidence, they failed to establish with reasonable certainty the

injured plaintiff's damages for past and future earnings.")

According to Linda's testimony, she was employed on a part-time basis for

Kaufman Management, the management company for her former employer Media

Ventures from January 2003, prior to the accident, until the company closed in August

2006. The claimant's counsel concedes that Linda lost no wages until November 2003

(see Claimant Linda Fainer's Post Trial Brief at p.22). From November 2003 to August

2006, Linda worked for Kaufman, at a part-time salary of approximately $50,000. The

Court finds no loss of earning damages for that period, as this was the same sum that

47

Linda was earning for some months prior to the accident.

The Court will now review Linda's lost earnings claim for the period from August 2006 to July 27, 2007 the last day of trial. Following this accident, Linda gave birth to two children, Ashley who was born in July 2004 and her second child on January 26, 2006. As a result, with reasonable certainty, her working time would be somewhat limited. In order to work, Linda would need help in taking care of the children. Further, as stated above, it is clear that she worked only part time for six months prior to the accident. In addition, significantly, the Court notes that the record reveals only one alleged attempt by Linda to obtain employment after August 2006. Linda testified that, at some unstated date, she tried to resume working for a "friend" as an office manager part-time, but, after a month or two she could not continue because of the pain. Neither the name of the "friend" or his or her company was disclosed.

Therefore, the Court finds that Linda failed to prove, by a preponderance of the evidence, that her injuries prevented her from doing any kind of work from August 2006 to the time of the trial. In addition, the claimant failed to prove that, but for her injuries, she would have found a job that paid her anything in the area of the $97,000 she previously earned with Kaufman Management. In fact, there is no evidence, either by Linda or an economist as to what her rate of pay would be if she obtained another similar position at any time during this period.

Linda's counsel contends that, starting in the Fall of 2003, she would have

48

returned to full employment with another job and, at the same time, "continue to assist

Kaufman . . . on weekends and evenings until it was completely wound down"

(Claimant's Post Trial Brief at 21). The Court finds that the claimant failed to prove this

allegation. Linda worked only part-time from January 2003 to June 7, 2003, the date of

the accident, and there is no credible evidence to establish, with reasonable certainty, that

in the Fall of 2003, she would have obtained a full-time job in addition to her ongoing

part-time work for Kaufman Management.

Accordingly, the Court finds that the claimant's evidence with respect to her claim

for past lost wages was speculative and does not support any award. *See e.g. McKithen,*

292 A.D.2d at 354, 738 N.Y.S.2d at 857 (2d Dep't 2002) (denying an award for past loss

of wages because the evidence presented was speculative).

### 4) As to Future Loss of Earnings

The claimant also had the burden of establishing damages for future loss of

earnings with reasonable certainty and such future loss must not be based on a speculative

premise. *Davis v. City of New York,* 264 A.D.2d 379, 693 N.Y.S.2d 230 (2d Dep't 1999);

*Johnson v. Colvin,* 145 A.D.2d 846, 535 N.Y.S.2d 833 (3d Dep't 1988). The rule as to

future loss of earnings was succinctly stated in *Earl v. Bouchard Transp. Co.,* 735 F.

Supp. 1167 (E.D.N.Y. 1990):

> In determining damages for the diminution in the plaintiff's
> earning capacity, courts have normally utilized an
> 'oversimplified formula . . . which seeks to determine what

49

> the [plaintiff's] earnings would have been had he survived
> in good health, multiplied by [plaintiff's] work life
> expectancy with the resultant dollar figure arrived at, then
> discounted to the present value.' *Connecticut National
> Bank v. Omi Corp.,* 733 F. Supp. 14 (S.D.N.Y. 1990)
> (Carter, J.); *Accord Williams v. United States,* 712 F. Supp.
> 1132, 1136 (S.D.N.Y. 1989) (Jones Act). In cases such as
> that at bar, past earnings -- in the absence of unusual proven
> circumstances – serve as a dependable and adequate guide
> to future loss."

*Id.* 1176.

The claimant's problem with regard to future loss of earnings is three fold. First,

her annual earnings at the time of the accident were reduced to approximately $50,000.

Second, this was a temporary position which expired on August 2006. Third, there is no

proof that the claimant even tried to work after August 2006. The injury which allegedly

keeps her from working, RSD, is, in the Court's view, a shadowy illness. There are

apparently no definitive clinical tests; there are no visual components; and its diagnosis

depends almost entirely on subjective complaints by the injured person.

Added to these non-definitive signs, in this case, is the claimant's own family

situation. After this accident, and only recently, Linda had two children, now aged three

and one, who require constant care and supervision. While the claimant's mother and

sister have assisted in caring for the two children, there apparently is no consideration of

third-party care. This situation could be a deterrent to a long-term responsible working

position. Also, as previously stated, there is no credible evidence that the claimant even

attempted to look for a job or tried to work. Even taking into consideration her pain in the left shoulder and back areas, the many daily medications she takes apparently permits some relief, at least in the mornings. Nor is there any proof in this case, by expert testimony, economist or otherwise, that there is a position for office manager or a similar employment available for Linda.

Reviewing all of this evidence, and the lack of evidence, the Court finds that the claimant Linda Fainer has failed to prove damages for future loss of earnings, with reasonable certainty. The Court finds that the award of such damages would be based on speculative premises, and, therefore no such damages are awarded.

### 5) As to Medical Expenses

The parties have stipulated that the past medical expenses are the total sum of $23,422.10. (See Claimant's Exh 12 and Tr 445-446). As to future medical expenses, Dr. Argoff testified that because of the nature of the RSD injury he could not estimate future medical expenses. Accordingly, so such damages are awarded.

### 6) As to Pre-Judgment Interest

In the claimant Linda Fainer's Post-Trial Brief (p.25), there is a contention that "this matter falls within the Court's general maritime jurisdiction 28 U.S.C. § 1333, therefore plaintiff is entitled to pre-judgment interest." The claimant cited two cases for this contention, *McCann v. U.S. Lines, Inc.*, 803 F.2d 771 (2d Cir. 1986), and *Independent Bulk Transp., Inc. v. Morania Abaco*, 676 F.2d 23 (2d Cir. 1982). A review

of these cases reveals that they involve pre-judgment interest on loss of earnings, *McCann*, 803 F.2d at 772-73, and property damage to a vessel, *Independent Bulk Transp.*, 676 F.2d at 24. In this case, the damages awarded are for personal injuries and pain and suffering, which type of damage is generally not subject to pre-judgment interest. Accordingly, no such interest is awarded.

### III. CONCLUSION

The Court finds that the claimant Linda Fainer proved, by a preponderance of the credible evidence, that the motor boat collision on June 9, 2003 in the Great South Bay was caused by the negligence of both motor boat operators Michael J. Starito, Jr. and Gregory Fainer. The Court further determines that the apportionment of liability for both causing the occurrence was Starito 85% and Fainer 15%.

In addition, the Court finds that the total amounts of damages with regard to the injuries to Linda Fainer, subject to the above apportionment, are as follows:

| | |
|---|---|
| 1. Injuries and pain and suffering to date | $750,000.00 |
| 2. Pain and suffering in the future (Less reduction to present value) | 500,000.00 |
| 3. Past medical expenses | 23,422.10 |

The attorneys and the parties are directed to appear in Court for a conference as to the future proceedings in this case on November 2, 2007 at 9:30 A.M.

**SO ORDERED**.

Dated:       Central Islip, New York
                October 24, 2007

_____
ARTHUR D. SPATT
United States District Judge

P-049